**Rod R. BLOEDOW, Plaintiff,**

v.

**CSX TRANSPORTATION, INC., and The Brotherhood of Locomotive Engineers, Defendants.**

No. 3:02CV7338.

United States District Court, N.D. Ohio, Eastern Division.

May 4, 2004.

John D. Franklin, Tracy A. Lipinski, Law Office of John D. Franklin, Toledo, OH, for Rod R. Bloedow, Plaintiff.

Todd A. Dawson, Baker & Hostetler, Cleveland, OH, for CSX Transportation, Inc., Defendant.

John B. Lewis, Baker & Hostetler, Cleveland, OH, for CSX Transportation, Inc., Defendant.

Harold A. Ross, Ross & Kraushaar, Cleveland, OH, for The Brotherhood of Locomotive Engineers, Defendant.

Jeremy R. Sayre, Ward & Smith, Raleigh, NC, for CSX Transportation, Inc., Defendant.

Michael S. Wolly, Zwerdling Paul Leibig Kahn & Wolly, Washington, DC, for The Brotherhood of Locomotive Engineers, Defendant.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

This action concerns Bloedow's seniority date as a locomotive engineer in the employ of CSX Transportation, Inc. ("CSX"). Under federal statute, Bloedow asserts three "hybrid" claims for breach of contract and breach of the duty of fair representation against CSX and his union, the Brotherhood of Locomotive Engineers ("BLE"). He also asserts a state common law claim for breach of contract. CSX and BLE filed summary judgment motions, which this court referred to a magistrate judge. For the reasons that follow, the court adopts Magistrate Judge Streepy's report and recommendation and grants summary judgment in favor of both defendants.

## I. DISCUSSION

### A. Background

Bloedow contends that his seniority date as a CSX locomotive engineer should be December 2, 1998. CSX hired Bloedow as a trainman-conductor in 1998 and he applied for the training course needed to become a locomotive engineer. In November 1998 there was a shortage of engineers at CSX's Walbridge, Ohio facility, prompting CSX to ask the trainmen's union ("UTU") to assign trainmen there to take the engineer training course. Bloedow was not given the opportunity to take the course that started on December 2, 1998, but some more junior trainmen were. Instead, Bloedow was enrolled in the next course, commencing on February 22, 1999.

On December 9, 1998 Bloedow sent a grievance letter to his UTU vice chairman, contending that Rule 97 of the 1994 collective bargaining agreement ("CBA") between CSX and the UTU obligated CSX to inform him of its need for engineers. On January 6, 1999 the UTU wrote a letter of complaint to CSX's Director of Employee Relations on Bloedow's behalf. The CSX official responded by letter dated January 20 and the UTU replied by letter dated January 28. The UTU and CSX apparently reached a common understanding: (1) Bloedow had been "runaround," i.e. bypassed by junior trainmen who were accepted into the December 1999 course; but (2) the UTU had agreed to waive the CBA's posting requirements due to the critical shortage of engineers. The UTU pointed out the practice of granting such bypassed employee the same seniority date as the junior employees accepted into training for the higher position before him.

On March 5, 1999 CSX agreed to resolve the dispute by promising that if Bloedow finished the February 1999 course, he would be accorded the December 1998 seniority date. This letter from CSX to the UTU is what Bloedow calls "the settlement agreement." (CSX's letter states that it sent a copy to a BLE Chairman Menefee, but Menefee denies ever receiving it.) In August 1999, Bloedow finished the engineers course (and became a mem-

ber of the BLE). Consistent with CSX's March 5, 1999 letter to the UTU, CSX posted Bloedow's seniority date as December 2, 1998.

In September 2000, however, CSX changed the date to February 22, 1999, apparently because the BLE's Menefee insisted the later date was the right one. Bloedow states that he became aware of the adverse change to his seniority date on September 15, 2000. He tried to have the earlier date reinstated, including meeting with Menefee. Menefee made hopeful comments but gave evasive answers to his questions and requests for the earlier date. After October 2000 Bloedow had no communication with Menefee, dealing instead with subordinate BLE official Barber. Bloedow and Barber exchanged numerous e-mails and telephone calls from about November 2000 through March 2002, but the BLE was unable or unwilling to ask CSX to reinstate the earlier seniority date.

According to Bloedow, in March 2002 he and Barber had a meeting in which Barber told him to go ahead and file a lawsuit if that was what he planned to do. On April 30, 2002 Bloedow received a letter from CSX stating that in August 2000, the BLE had "directed" CSX to move his seniority date to February 1999. Bloedow filed the instant action on July 3, 2002.

**B. Bloedow's Federal "Hybrid" Claims are Barred as Untimely**

 Section 9(a) of the National Labor Relations Act ("NLRA") grants unions exclusive representational status over employees who comprise a bargaining unit and imposes a duty of fair representation on the union. *See EEOC v. The ESAB Group,* 208 F.Supp.2d 827, 832 (N.D.Ohio 2002) (citing *Humphrey v. Moore,* 375 U.S. 335, 342, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964)), *op. withdrawn in part o.g.* 2002 WL 1283680, 13 A.D. Cases 179 (2002). This duty requires the union to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct. *Black v. Ryder,* 15 F.3d 573, 584 (6th Cir.1994). The union's duty does not depend on the existence of a collective bargaining agreement; rather, it "flows from the union's statutory position as the exclusive representative and exists both before and after the execution of an agreement." *Pratt v. UAW,* 939 F.2d 385, 388 (6th Cir.1991). The NLRA provides,

> Whenever it is charged that any person has engaged in or is engaging in any such unfair labor practice, the Board shall have power to.... Provided: that no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board....

29 U.S.C. § 160(b). In 1983 the Supreme Court adopted § 160(b)'s six month limitations period for all hybrid fair representation/breach of contract claims "that implicate concerns similar to those that are at stake in unfair labor practice charges brought under the NLRA." *Martin v. Lake Cty. Sewer Co.,* 269 F.3d 673, 677 (6th Cir.2001) (citing *DelCostello v. IBT,* 462 U.S. 151, 169, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983)).

 Bloedow filed this action on July 3, 2002, so his claims are timely only if the alleged unfair representation occurred on or after January 3, 2002. The statute of limitations on such claims begins to run "when an employee discovers, or should have discovered with exercise of due diligence, acts giving rise to the cause of action." *Martin,* 269 F.3d at 678–79 (quoting *Wilson v. IBT,* 83 F.3d 747, 757 (6th Cir.), *reh'g denied,* 1996 WL 441029, *cert. denied,* 519 U.S. 1041, 117 S.Ct. 610, 136 L.Ed.2d 535 (1996)). A hybrid claim "accrues against a company defendant at the

same time it accrues against a union defendant, since the predicate for the entire action is that the union breached its duty of fair representation." *Rubalcava v. Wheeling–Pittsburgh Steel Corp.*, 1985 WL 9358, at *2 (S.D.Ohio Apr.11, 1985) (citation omitted); *see also Howell v. GMC*, 19 Fed.Appx. 163, 166, 2001 WL 856953, at *2 (6th Cir.2001) (citing *Fox v. Parker Hannifin Corp.*, 914 F.2d 795, 803 (6th Cir. 1990)).

■ First, as Magistrate Judge Streepy noted, Bloedow knew or should have known in September 2000 that CSX had moved back his engineer seniority date. Bloedow responded that the issue is not when he discovered the change in the seniority date, but when he discovered that CSX and BLE "colluded and conspired" to breach the March 5, 1999 letter—which he characterizes as a "settlement agreement"—wherein CSX assured UTU that he would be accorded the earlier seniority date. By Bloedow's own statement, he sent an e-mail in January 2001 opining that BLE official Menefee went "out of the way to diminish and destroy" Bloedow's seniority rights. Then, in October 2001 Bloedow sent an e-mail stating that Menefee had "corrupted" Bloedow's seniority by calling CSX to advise them that the later seniority date was appropriate under the CBA.

These facts support the finding that by January 2001, and certainly October 2001, Bloedow knew CSX and the BLE might have acted together to change his seniority date, and that BLE had not rendered fair representation in his view. Indeed, by that point Bloedow had reason to know that the BLE (through Menefee) had actively opposed giving him the earlier seniority date. *See EEOC v. The ESAB Group*, 208 F.Supp.2d 827, 832 (N.D.Ohio 2002) (employee's hybrid claim accrued when it became "clear that ... union officials opposed giving [him] the [disability]

accommodation he sought since they believed that it conflicted with the seniority provisions of the" CBA).

Even if Bloedow honestly believed there was still a chance of resolving his grievance without going to court, that belief does not delay accrual of his claims. *See Rubalcava v. Wheeling–Pittsburgh Steel Corp.*, 1985 WL 9358, at *2 (S.D.Ohio Apr.11, 1985) (claim accrues when plaintiff should have known union breached duty, "even if some possibility of non-judicial enforcement remains") (citing, *inter alia*, *Rose v. GMC*, 573 F.Supp. 747, 752 (S.D.Ohio 1983)); *accord Santos v. District Council of NYC*, 619 F.2d 963, 969 (2d Cir.1980).

Moreover, Bloedow's October 5, 2001 e-mail to Menefee's subordinate explicitly set a date of December 15, 2001 by which he threatened to sue if BLE (and CSX) did not correct his seniority date. If Bloedow himself felt a lawsuit was appropriate and necessary to enforce his rights—namely, his right to fair representation, and to enforcement of the alleged March 5, 1999 agreement between CSX and BLE—he necessarily knew of the basis for his claims when he communicated the deadline.

When Bloedow's declared deadline came and went with no action by the BLE to pursue his grievance, that was further reason to realize the BLE was "stonewalling" and not providing fair representation—especially in light of the BLE's alleged inaction in response to his grievance in the preceding months. *Cf. Martin v. Lake Cty. Sewer Co.*, 269 F.3d 673, 678–79 (6th Cir.2001) (when union failed to give plaintiff a copy of the CBA for two months after his termination, "[h]e should have been aware by then that the Union was not going to file a grievance on his behalf, especially given the Union's alleged reluctance to pursue his" grievances in the past); *Konarske v. Ford Motor Co.*, 1992

WL 584105, at *4 (E.D.Mich. Aug. 24, 1992) (hybrid claim accrued at point when plaintiff came to "underst[and] that no grievance was going to be filed on his behalf by the union").

■ For these reasons, the Magistrate Judge Streepy correctly concluded that there is no genuine issue as to the fact that by December 15, 2001, Bloedow had sufficient knowledge to trigger accrual of his hybrid claims.[1] Consequently, absent equitable tolling, section 160(b)'s six month limitations period on those claims expired no later than May 15, 2002, two months before Bloedow filed this action.

■ Lastly, the magistrate judge correctly concluded that Bloedow has not shown fraudulent concealment by CSX or BLE that would toll the limitations period on his hybrid claims. As the Circuit stated in a similar action against the BLE, the employee's failure to file his hybrid claims could be excused if the plaintiff could demonstrate that the defendants fraudulently concealed any facts respecting the accrual or merits of his claim. [B]ut in order to prove fraudulent concealment, plaintiff must show that he failed to discover facts that serve as the basis of his cause of action despite due diligence on his part to discover the facts, and that the concealment was fraudulently committed by the party or parties sought to be held responsible by the plaintiff.

■ *Hanely v. BLE,* 69 Fed.Appx. 292, at 297, 2003 WL 21525117, at *5 (6th Cir. 2003) (quoting *Chrysler Workers Ass'n v.* *Chrysler Corp.,* 834 F.2d 573, 579 (6th Cir.1987), *cert. denied,* 486 U.S. 1033, 108 S.Ct. 2017, 100 L.Ed.2d 604 (1988)); *see also Foster v. Forest Hill Dairy,* 28 F.3d 1213, 1994 WL 330034 (6th Cir.1994). As in *Hanely,* even if Menefee or others effectively assured Bloedow his grievance would be addressed, that is not enough for fraudulent concealment under the circumstances. *Cf. Borkins v. USPS,* 1994 WL 780900, at *2 (E.D.Mich. May 13, 1994) (hybrid claim was untimely, notwithstanding plaintiff's argument that limitations period, should be tolled for period during which union misled him into believing he might be reinstated), *aff'd,* 41 F.3d 1506 (6th Cir.1994), *cert. denied,* 516 U.S. 826, 116 S.Ct. 91, 133 L.Ed.2d 48 (1995).

■ Even if Bloedow sincerely believed CSX and BLE were addressing his grievances, and refrained from suing on that basis, that does not excuse his untimeliness. It was manifestly unreasonable for him to keep "buying" such hollow assurances—if they were assurances—over an extended period during which he himself says the company and union met his grievance with inaction and evasion. It is of no avail that the BLE never expressly told Bloedow it would not pursue his grievance. "A prospective § 301 hybrid claimant need not have official notification of a union's possible breach of its duty of fair representation in order for rights to accrue for statute of limitations purposes. Rather, prolonged or unreasonable delay by the union is enough to put a person on notice

1. The fact that the union (in Bloedow's view) continued to breach its duty of fair representation after that date, does not extend the limitations period on a continuing violation theory. *See Perez v. Roadway Express,* 281 F.Supp.2d 936, 940 (N.D.Ohio 2003); *Former Frigidaire Employees Ass'n v. Internat'l Union of Elec., Radio and Mach. Workers,* 573 F.Supp. 59, 62 (S.D.Ohio 1983); *Adkins v. GMC,* 573 F.Supp. 1188, 1192 (S.D.Ohio 1983) ("Once the original damage is lodged, the mere fact that the Defendants are 'continuing' to implement allegedly improper collective bargaining agreements does not convert Plaintiffs' loss of jobs into a 'continuing violation.'"). *Accord Tapia v. Local 11,* 11 Fed.Appx. 941, 2001 WL 630260 (9th Cir. 2001) ("there is no 'continuing violations' theory for hybrid claims") (citation omitted).

of the existence of her claim." *Gately v. Textron, Inc.*, 125 F.3d 855, 1997 WL 618825, at \*2 (6th Cir.1997) (per curiam) (citing *Pantoja v. Holland Motor Express*, 965 F.2d 323, 327 (7th Cir.1992)); *see also Bippus v. Local 100*, 1984 WL 2315, at \*6 (S.D.Ohio Jan. 10, 1984) ("As they knew or should have known that the grievances would not be processed, they surely could have taken some action in this regard many months earlier"), *aff'd*, 770 F.2d 165, 1985 WL 12785 (6th Cir. July 17), *cert. denied*, 474 U.S. 1007, 106 S.Ct. 530, 88 L.Ed.2d 461 (1985). For example, when affirming the dismissal of a hybrid claim as untimely, our Circuit wrote, "In light of plaintiff's testimony that he felt the Union was giving him the 'run-around,' the Union's inactivity after the ... letter should have put him on notice of his claim against the Union." *Yates v. Memphis Bakery Employers Ass'n*, 907 F.2d 151, 1990 WL 94211 (6th Cir.1990), *cert. denied*, 498 U.S. 986, 111 S.Ct. 522, 112 L.Ed.2d 533 (1990).

In addition, there is no evidence that anyone tried to conceal the BLE's role in inducing CSX to change Bloedow's seniority date. On September 20, 2000 UTU general chairman Reed wrote to CSX on behalf of Bloedow, acknowledging that BLE official Menefee had objected to giving Bloedow the earlier date. *See* CSX's Response, Ex. 1. The next day, CSX's senior director for labor relations sent a response stating, "It is quite clear in our conversations with General Chairman Menefee that he is unwilling to restore Mr. Bloedow's seniority to December 2, 1998." *Id.*, Ex. 2. In short, nothing CSX or BLE allegedly did or said could have prevented a reasonable person in Bloedow's position from realizing that there was a potential basis for his claims against CSX and the BLE by December 2001 or earlier, *See Noble v. Chrysler*, 32 F.3d 997, 1002 (6th Cir.1994) (rejecting fraudulent conceal-

ment argument and refusing to toll limitations period on hybrid claims).

## C. Bloedow Has Waived his Right to Appeal the Dismissal of his State Law Claim

■■■■ The magistrate judge recommended that Bloedow's state law claim be dismissed as preempted by federal law. *Cf. Bickers v. Internat'l Ass'n of Machinists & Aerospace Workers*, 8 Fed.Appx. 514, 516, 2001 WL 493411, at \*2 (6th Cir. 2001) (state law contract claim was preempted because it was based on same allegations as claims for breach of duty of fair representation) (citations omitted). Bloedow did not object to this portion of the report, so he has waived his right to appellate review thereof. *See James v. Hurley*, 93 Fed.Appx. 744, 2004 WL 540474 (6th Cir.2004); *Sutton v. SBA*, 92 Fed.Appx. 112, 114–15, 2003 WL 22976561, at \*1 (6th Cir.2003). The report advised Bloedow of the deadline for objections, and warned that any objection not timely filed would be waived. *See Purk v. US*, 79 Fed.Appx. 107, 2003 WL 22435642 (6th Cir.2003). Moreover, Bloedow was aware of the need to object, because he did so with regard to the rest of the report. *Cf. Young v. S.E. Johnson Cos.*, 89 Fed.Appx. 576, 577, 2004 WL 500980, at \*1 (6th Cir. 2004) (plaintiff was "clearly aware of the requirement to file objections" to second report, "as he had filed objections to the magistrate judge's original report").

## II. CONCLUSION

The report and recommendation of the magistrate judge is adopted, and CSX and BLE's motions for summary judgment [docs. 30 and 33] are granted. This is a final and appealable order.

IT IS SO ORDERED.

## REPORT AND RECOMMENDED DECISION OF MAGISTRATE JUDGE

STREEPY, United States Magistrate Judge.

Rod Bloedow (Bloedow) has sued CSX Transportation, Inc. (CSX) and the Brotherhood of Locomotive Engineers (BLE) in a four count complaint alleging hybrid claims of breach of contract and denial of the duty of fair representation. The first three counts are brought under federal law pursuant to 45 U.S.C. §§ 151–188. (Complaint at ¶ 5.) The fourth count is a state action brought under the court's supplemental jurisdiction.[1]

CSX (doc. 33) and BLE (doc. 30) have each brought a separate motion for summary judgment.

Summary judgment is appropriate where the entire record "shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c). Non-moving parties may rest neither upon the mere allegations of their pleadings nor upon general allegations that issues of fact may exist. *See Bryant v. Commonwealth of Kentucky*, 490 F.2d 1273 (6th Cir.1974). *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), holds that:

> . . . Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

The evidence need not be in a form admissible at trial in order to avoid summary judgment, but Rule 56(e) requires the opposing party

> to go beyond the pleadings and by [his] own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548.

The Sixth Circuit in *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989), has interpreted *Celotex* and two related cases, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), as establishing a "new era" of favorable regard for summary judgment motions. *Street*, at 1479–80, sets forth ten "new era" principles:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent,

---

1. The first count is brought against both CSX and BLE and alleges the two defendants colluded for the purpose of CSX breaching a collective bargaining agreement it entered into with a non-party union, the United Transportation Union (UTU), in violation of 45 U.S.C. §§ 151, *et seq.* (Complaint at ¶¶ 26–33.) Count two alleges BLE violated its duty of fair representation of Bloedow and CSX conspired with BLE for the same purpose in violation of 29 U.S.C. § 158(b). (Complaint at ¶¶ 34–44.) Count three is brought against CSX only, alleging it breached a settlement agreement it entered into with UTU. (Complaint at ¶¶ 45–51.) Count four alleges a state action of interference with contract and is brought only against BLE, alleging it interfered with the contract referred to in count three. (Complaint at ¶¶ 52–58.)

having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

6. As on federal directed verdict motions, the "scintilla rule" applies, *i.e.*, the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for

the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

The issues revolve around whether Bloedow is entitled to a seniority date in his job as a locomotive engineer for CSX of December 2, 1998 or whether February 22, 1999 is his correct seniority date. The following evidence is relevant.

CSX is a railroad company that operates a railroad system of approximately 23,000 miles in 23 states and a few other areas. It is a party to many collective bargaining agreements (CBA), including a CBA with the United Transportation Union (UTU) for train-service workers and a separate CBA with the BLE for engine-service workers, which includes locomotive engineers. (CSX exhibit 8,Hiel declaration at ¶¶ 1–4, attached to doc. 33.) [2]

Bloedow was hired by CSX in 1998 as a trainman-conductor. As a trainman, he was a member of the UTU and came under its CBA with CSX. Shortly thereafter, he began seeking a locomotive engineer position, thus applied to begin the schooling that CSX conducted periodically to teach employees, such as CSX trainmen, to become locomotive engineers.

In December of 1998, there was a shortage of locomotive engineers at its Walbridge, Ohio, location (which is located close to Toledo, Ohio), prompting CSX to contact UTU for the purpose of assigning trainmen at that location to take an engineer training class, lasting about six months, commencing on December 2, 1998.

Bloedow was not given the opportunity to take that class, but he was eventually enrolled in the next class commencing February 22, 1999.

**2.** The court has designated the exhibits attached to the motion of CSX in numerical order to bring some semblance of organiza-

tion to the CSX exhibits that are attached to document 33.

Bloedow complained to the UTU about not being enrolled in the earlier class which led J.T. Reed (Reed), the general chairman of UTU, to write a letter of complaint, dated January 6, 1999, to CSX on behalf of Bloedow. Reed contended Bloedow should have been selected for training in the December 2, 1998 class, thus should receive the seniority date of December 2, 1998.

On March 5, 1999, CSX sent a letter to Reed noting Bloedow began his engineer schooling on February 22, 1999, and if he successfully completed it, he would become a locomotive engineer at Walbridge. CSX further stated that "Mr. Bloedow's engineer seniority date will be December 2, 1998, tiebreaker 003 which will place him in proper standing among his peers." (CSX exhibit 4, attached to doc. 33.)

The March 5, 1999 CSX letter indicates a carbon copy was sent to D.M. Menefee (Menefee), a union official with the BLE who played a major role in seniority issues involving BLE locomotive engineers. There is also evidence that CSX telephonically contacted Menefee to discuss the proposed favorable change in Bloedow's seniority and that Menefee agreed to it. (Hiel deposition at 100–01.)

After Bloedow successfully completed his engineer training, he became a member of the BLE, the union which had jurisdiction over locomotive engineers. CSX posted his seniority date as December 2, 1998. (CSX 8, Hiel declaration at ¶ 8.)

In approximately September of 2000, CSX changed Bloedow's seniority date from December 2, 1998 to February 22, 1999. A significant cause of this change came from Menefee's insistence to CSX that the correct date was February 22, 1999.

Bloedow became aware CSX changed his seniority on September 15, 2000. (Bloedow deposition at 77.) Although he was no longer a UTU member, UTU official Reed sent a letter on September 20, 2000 to CSX complaining of the change in seniority date.

CSX thereafter contacted Menefee of the BLE, who stated he had never agreed, and would never agree, to Bloedow's seniority being December 2, 1998. Rather, Menefee insisted on February 22, 1999 as the seniority date. CSX agreed with BLE's position and as a result, continued Bloedow's seniority date as February 22, 1999. (CSX exhibit 8 at ¶¶ 10–11.)

Bloedow embarked on an extensive effort to get his seniority date of December 2, 1998 reinstated. This included traveling from his Michigan home to Florida in October of 2000 and talking personally to a number of BLE officials, including Menefee. His efforts continued through 2000, 2001, and into 2002.

Bloedow has submitted evidence that although Menefee had essentially forced CSX to change Bloedow's seniority to February 22, 1999, Menefee did not so inform Bloedow. Instead, in October of 2000 and thereafter, Menefee made hopeful comments to Bloedow, gave evasive answers, and delayed responses to Bloedow's requests that Menefee change his seniority date to December 2, 1998.

The last direct communication Bloedow had with Menefee was their meeting in October of 2000. Thereafter, Bloedow communicated directly with another BLE officer, William Barber (Barber), who had subordinate authority to that of Menefee. Bloedow has submitted evidence Barber continued to inform Bloedow that Menefee had not yet reviewed all the evidence and that Menefee was not ignoring Bloedow's concerns. Among other excuses, Barber stated there was a backlog of problems and a lack of manpower to handle them which was causing the delay.

There is also evidence that Bloedow did not believe Menefee or Barber. His skepticism is best reflected in many e-mails between Bloedow and Barber.

In an e-mail to Barber, dated January 30, 2001, Bloedow stated Menefee had forced the change in seniority dates. Referring to his Florida meeting with Menefee in October of 2000, Bloedow stated "I was galled by Menefee's sanctimonious fuming about the UTU obtaining an improper settlement." He further stated Menefee "has gone out of his way to diminish and destroy" Bloedow's seniority rights. (CSX exhibit 11 at 2–3.) In an e-mail, dated January 31, 2001, Bloedow stated that another union member had "Mr. Menefee illegally strip me of my engineer seniority." (*Id.* at 2.)

In an e-mail to Barber on July 17, 2001, Bloedow noted he had recently talked to, among others, a UTU official, and the "UTU has indicated a readiness to progress my claim, provided I resume membership." The UTU official said it had recently won a CSX seniority case in which "the neutral blasted Menefee." Bloedow closed by saying, "I have also consulted with two labor attorneys, and both indicated I should bring suit against Menefee, Gordon [an official with CSX] and CSX." (*Id.* at 1.)

An e-mail on October 4, 2001 asked Barber about the status of Bloedow's seniority case. Bloedow stated if it "is not satisfactorily resolved by December 15, 2001, I am going to file a very well prepared suit against all concerned." (CSX exhibit 12 at 2.)

In an October 5, 2001 e-mail, Bloedow informed Barber his seniority had been established in a signed settlement (an apparent reference to the March 5, 1999 letter from CSX to the UTU), and that "BLE robbed me of it after Menefee learned of the UTU's success with" CSX. He stated the "BLE corrupted my seniori-

ty with a simple phone call to" CSX and that "Menefee could make another phone call at your urging, correcting his arrogant and mistaken judgment. But he won't." He said Barber could correct the matter with a few well placed calls and had a duty to do so. He closed by saying "the BLE has until December 15, 2001, or I take my case to court." (*Id.* at 1.)

A Bloedow e-mail to Barber on October 22, 2001 stated another union member had "confirmed Don Menefee's role in improperly altering my seniority." (CSX exhibit 13 at 3.)

On January 2, 2002, Barber informed Bloedow by e-mail that the seniority dispute was being reviewed by an arbitrator, stating the "seniority disputes are being reviewed, and to the best of my knowledge nothing will change until the arbitrator makes his ruling on several issues regarding the subject." The ruling was scheduled for mid-January of 2002. (*Id.* at 1.) Barber later testified he was told of the arbitrator but did not know whether his decision would have any impact upon Bloedow's seniority. (Barber deposition at 109–10.)

Bloedow continued to communicate with Barber into March of 2002, seeking his help to bring a successful resolution of the matter through Menefee. (Barber deposition at 111–12, 115, 116.) Finally, Bloedow had a personal conversation in March of 2002 with Barber who told Bloedow that if he was going to file a lawsuit, he should go ahead. (Bloedow deposition at 170–72.)

On April 30, 2002, Bloedow received a letter from the law department of CSX stating that on August 18, 2000, the BLE had complained to CSX about Bloedow's December 2, 1998 seniority date. CSX went on to state that BLE "directed" CSX to change the date to February 22, 1999,

and CSX complied. (Hiel deposition at 157, exhibit 20.)

Bloedow filed his lawsuit on July 3, 2002.

## I. Counts One, Two and Three

The first three counts are brought pursuant to the Railway Labor Act (RLA), 45 U.S.C. § 151, *et seq*. Both defendants contend that Bloedow failed to file his action within the statute of limitations under the RLA.

■ The six month limitation period under 29 U.S.C. § 160(b) applies to hybrid unfair representation suits brought pursuant to the RLA. *Loew v. Consolidated Rail Corp.*, 812 F.2d 1407, 1987 WL 35879 (6th Cir.1987) (TABLE, text in WESTLAW). Bloedow filed this action on July 3, 2002, thus to come within the six month statute of limitations, the unfair representation by the BLE had to have occurred on January 3, 2002, or thereafter. The general rule is that "the statute of limitations begins to run when the potential plaintiff knows or should have known of the union's alleged breach of its duty of fair representation." *Id.* at *3 (eliminating quotation marks and citation of authority); *see also Ryan v. General Motors Corp.*, 929 F.2d 1105, 1111 (6th Cir.1989).

*Loew* involved seniority issues under a 1975 CBA and a 1981 CBA. Since CSX had posted a seniority roster in late 1977, and all plaintiffs had received a copy of the CBA that included it, "they all should have known at that time that the seniority agreement included prior rights. Therefore, they knew or should have known as of 1977 that the unions might have breached their duty of fair representation. Consequently, this claim was time-barred." The court made similar findings concerning the 1981 claim. *Id.* at 3.

Applying *Loew* herein, CSX was caught between conflicting interpretations of the UTU and the BLE based on their respective CBAs, and Bloedow was certainly aware of this conflict no later than September of 2000 when CSX altered his seniority date from the previously set December 5, 1998 to the newly set February 22, 1999. Thus, he knew, or should have known, of the dispute regarding the correct seniority date about 22 months before he filed his lawsuit.

Bloedow contends that the issue is not one of his seniority; rather, he claims "that both CSX and BLE colluded and conspired together to breach the March 5, 1999 settlement agreement between CSX and the UTU, which placed Bloedow's seniority as December 2, 1998." (Doc. 39 at 19.) The effort to shift the issue from one of seniority to one of collusion is dubious, but assuming the issue is when Bloedow knew, or should have known, that there was a conspiracy, the result is the same.

■ In *Hanely v. International Brotherhood of Locomotive Engineers*, 69 Fed. Appx. 292, 2003 WL 21525117 (6th Cir. 2003), the plaintiff, a railroad engineer employed by CSX, filed suit against CSX, the BLE, and Menefee, among others, in a hybrid breach of contract/breach of the duty of fair representation action under the RLA. Determining the date the statute begins to run is "an objective one: 'the asserted actual knowledge of the plaintiffs is not determinative if they did not act as reasonable persons and, in effect, closed their eyes to evidence and objective facts concerning the accrual of their right to sue.' *Chrysler Workers Ass'n. v. Chrysler Corp.*, 834 F.2d 573, 579 (6th Cir.1987)." *Hanely*, 69 Fed.Appx. 292, 297, 2003 WL 21525117, at *5. The plaintiff in *Hanely* argued the period was tolled "because of Menefee's assurances that he was prosecuting Plaintiff's claim." *Hanely* noted the failure to file the hybrid action within six months, *id.* at 69 Fed.Appx. at 299, 2003 WL 21525117 *7,

could be excused if the plaintiff could demonstrate that "the defendants fraudulently concealed any facts respecting the accrual or merits of his claim." ...but "[i]n order to prove fraudulent concealment, plaintiff must show that he failed to discover facts that serve as the basis of his cause of action despite due diligence on his part to discover the facts, and that the concealment was fraudulently committed by the party or parties sought to be held responsible by the plaintiff." ...Moreover, even if a plaintiff adduces sufficient evidence to invoke the fraudulent concealment doctrine, it may only be invoked against the party or parties that engaged in the misleading conduct."

*Hanely* concluded the employee had failed to show any misleading conduct by CSX or BLE that would excuse his timely filing. "As to Menefee, although his actions present a closer call inasmuch as the record indicates that Menefee made assurances to Plaintiff that his claim is being pursued, the record also indicates that Plaintiff could have discovered the status of his claim through his own diligence, and Plaintiff provides no argument to the contrary." *Id. Hanely* affirmed the summary judgments in favor of all defendants. *Id.* at 69 Fed.Appx. at 300, 2003 WL 21525117 *8.

▮▮▮ Knowing that CSX changed its decision as to what seniority date applied to Bloedow, first agreeing with the UTU it was December 3, 1998, then subsequently, in September of 2000 changing it to February 22, 1999, could reasonably reflect knowledge of a conspiracy between CSX and BLE. The fact Bloedow was "galled" in his October 2000 meeting with Menefee by Menefee's "sanctimonious fuming" that UTU had obtained an improper settlement with CSX (an apparent reference to the March 5, 1999 CSX letter) is further evidence. Bloedow's opinion in January of

2001 that Menefee went "out of the way to diminish and destroy" Bloedow's seniority rights is further evidence. Obtaining legal advice in July of 2001, about a year before filing his lawsuit, that he should sue both CSX and Menefee further indicates knowledge. *Vadino v. A. Valey Engineers,* 903 F.2d 253, 262 n. 12 (3rd Cir.1990). His October 2001 e-mail that Menefee "corrupted" Bloedow's seniority by making a phone call to CSX is further evidence of knowledge. Moreover, "[p]rolonged inaction is sufficient to give a diligent plaintiff notice that the union breached its duty of fair representation." *Pantoja v. Holland Motor Express, Inc.,* 965 F.2d 323, 327 (7th Cir.1992). Bloedow was aware of BLE's inaction in a portion of 2000 and throughout 2001. Indeed, he placed a deadline of December 15, 2001 for BLE to correct his seniority date or he would file a lawsuit. The failure of BLE to meet the deadline was further notice to Bloedow.

Combining the above circumstances, there is no genuine issue whether, by December 15, 2001, Bloedow knew, or reasonably should have known, that CSX and BLE conspired to change his seniority date. The evidence shows a reasonable person would know, or at least should have known. Thus, filing the lawsuit in July of 2002 was past the six month limitations period.

## II. Count Four

Count four is a state cause of action brought under Ohio law. It claims the BLE interfered with the UTU/CSX settlement agreement of March 5, 1999. Both defendants claim this count is preempted by the RLA and Bloedow has not responded to this argument.

▮▮▮ The RLA preempts a state cause of action unless it involves rights and obligations that exist independent of the CBA. *Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 260, 114 S.Ct. 2239, 129 L.Ed.2d

203 (1994). In *Jones v. General Motors Corp.*, 939 F.2d 380 (6th Cir.1991), the terminated plaintiff filed a federal breach of duty of fair representation under the Labor Management Relations Act (LMRA) claim against his union and a state law breach of contract claim against his employer. The plaintiff began the CBA grievance process, but before it was done, "the UAW and GM struck a deal," *i.e.*, plaintiff would be reinstated if he met certain conditions. *Id.* at 381. His state law claim was based upon an alleged breach of this agreement. *Jones* held preemption occurs if the state claim is intertwined with the CBA terms and when the application of state law requires that the CBA be interpreted. The settlement contract at issue, *id.* 382,

> was arrived at by virtue of a grievance process established by a collective bargaining agreement, signed only by the parties engaged in collective bargaining, and promised reinstatement to a job whose terms and conditions are created by and subject to a collective bargaining agreement. The resolution of this claim will not involve the direct interpretation of a precise term of the CBA, but it will require a court to address relationships that have been created through the collective bargaining process and to mediate a dispute founded upon rights created by a CBA.

The court held this process meant that the state claim was preempted. *Id.* at 382–83.

In *Brown v. American Airlines, Inc.*, 593 F.2d 652 (5th Cir.1979), a suit was brought under the RLA by an employee who was laid off by the defendant airline, prompting him to file a grievance under the CBA in effect between his employer and his union. He withdrew his grievance on the ground it was in exchange for a promise from the airline that he would be reclassified if he met certain conditions. When the airline refused to reclassify him despite meeting the conditions, he sued in federal court claiming breach of contract under state common law. *Brown* found the RLA preempted the state claim because the employee's layoff was based upon the CBA, and the issue of whether the employer was obligated to reinstate him would depend on interpretation of the CBA, *i.e.*, the differing claims of the parties "stem from differing interpretations of the collective bargaining agreement." *Id.* at 654. *Brown* was recently relied upon by the Sixth Circuit. *See Schirrick v. Butler Aviation*, 25 F.3d 1050, 1994 WL 242409, at *4 (6th Cir.1994) (TABLE, text WESTLAW).

Count three, brought under the RLA, contends CSX breached the March 5, 1999 settlement agreement, the same agreement which is the subject of count four. Count two, brought under the RLA, alleges, in part, the BLE breached its duty of fair representation by conspiring with CSX to breach the same March 5, 1999 settlement agreement. Plaintiff's brief in opposition to both motions analyzes various sections of the UTU and BLE CBAs with regard to the issue of whether there was a breach of the duty of fair representation. (Doc. 39 at 34–38) The proper interpretation of relevant terms of each CBA and related documents is also argued by BLE (doc. 30 at 17–19) and CSX (doc. 33 at 16–18).

It is evident Bloedow's rights under count four come from relationships created by the collective bargaining process and will be determined in part by interpreting and comparing the two CBAs, which means the count is preempted by the RLA.

## RECOMMENDATION

It is recommended that the two motions for summary judgment be granted.

Oct. 24, 2003.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice. Failure to file objections within the specified time WAIVES the right to appeal the District Court's order. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).